**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **SUZANNE GUIRAGOSS,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 1:06cv187** |
| | ) | |
| **FOUAD KHOURY** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **KHOURY BROTHERS LTD.** | ) | |
| **t/a KHOURY BROS. JEWELERS and** | ) | |
| **KHOURY BROS. JEWELERS, INC.** | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

_____At issue on summary judgment in this ERISA[1] and common law breach of contract and

fraud case brought by a former salesclerk of a jewelry store against the jewelry store and store

owner are the following questions:

　　　1.  Is the pension benefits agreement between the plaintiff salesclerk and her employer a
plan governed by ERISA?

　　　2.  If the Plan is governed by ERISA, are plaintiff's state law claims preempted?

　　　3.  If the Plan is governed by ERISA, is it a "top hat" plan, exempt from ERISA's
fiduciary and funding requirements, such that plaintiff has no legal claims against the employer?

---

[1]Employee Retirement Income Security Act, 29 U.S.C. §§ 1001 *et seq*.

**I.**[2]

Plaintiff, Suzanne Guiragoss, was an employee of Khoury Brothers Jewelers ("Khoury Bros.") from 1994 to 2004.  In 1994, Khoury Bros. hired her as a salesclerk for its retail store in Tysons Corner, Virginia.  Although never an officer of the company, she eventually attained "keyholder" status, meaning she was a salesclerk entrusted to open and close the store according to the company's security policies.  Defendant, Khoury Bros., is a small, family-owned business incorporated in Maryland that operates jewelry retail stores in Maryland and Virginia.  Defendant, Fouad Khoury, is an owner of Khoury Bros. and acted as Guiragoss' supervisor for the duration of her employment.  He is also the administrator of the Khoury Bros.' deferred compensation plan ("Plan").

Although the record is unclear on the precise genesis of the plan, it appears it was created in 1992 and applies only to employees at the Khoury Bros.' store in Tysons Corners, Virginia.  It also appears that the first Plan member in 1992 was Brian Widdowson, a full-time salesclerk.  Guiragoss was not given the option of joining the Plan when she was hired in 1994.  The following year, however, in April 1995, Khoury invited Guiragoss to enroll in the Plan by signing (i) the deferred compensation agreement; (ii) a non-compete agreement; and (iii) an employment agreement.  Guiragoss declined to sign the non-compete and employment agreements, but she did sign the deferred compensation agreement and thus became a Plan participant in 1995.

---

[2]The facts in the summary judgment record are essentially undisputed.  Where the facts are in dispute, the materiality is noted and analysis proceeds on the assumption favorable to the non-moving party.  *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1985).

Although the Plan was presented to potential participants as an individual agreement between the employee and Khoury Bros., each individual agreement was identical in form, that is, they contained the same terms, designated the same plan administrator, and established the same claims procedure.  Khoury contends he extended the offer of Plan participation to select individuals, chosen for their current and potential contributions to the success of Khoury Bros.; he intended the Plan to serve as a means of rewarding and retaining these valuable employees. Guiragoss disputes this assertion.  She contends, instead, that the Plan was offered to all employees.[3]  Moreover, she points out that, as a mere salesclerk, she possessed no unique skills enabling her to make a major contribution to Khoury Bros.' success.

In 1995, at the time Khoury offered Guiragoss the opportunity to participate in the Plan, Guiragoss had been working as a salesclerk for just under a year and her salary was commensurate with the salaries of Khoury Bros.' other full-time salesclerks.  In 1994, she earned $16,800 for nine months of work.  When adjusted to reflect twelve months of work, it appears that she received the eighth or ninth highest salary of Khoury Bros.' twelve full-time employees. In 1995, when Guiragoss enrolled in the Plan, she earned $32,950, the fifth highest salary of Khoury Bros.' eleven full-time employees.  At that time, the only other Plan participant was Brian Widdowson, another salesclerk, who enrolled in October 1992, at which time his was the seventh highest salary of eleven full-time employees.

The Plan's membership increased to three in 1997.  Yet, the following year–1998–Plan

---

[3]Apart from her contention to this effect, Guiragoss has not presented any evidence showing that all employees were invited to join.  The employee records produced by Khoury Bros. also fail to reflect or address whether all employees were invited to join and, if not, specifically which employees were invited to join.  This dispute is immaterial, however, because the remaining undisputed evidence is ample to support, indeed compel, the result reached here.

membership fell to one–Guiragoss.  This drop in Plan membership apparently occurred because in 1998 Khoury Bros. established a § 401(k) plan that allowed employees to make contributions to their own retirement funds.  In any event, no employees joined the Plan after 1998, leaving Guiragoss as the Plan's sole member from 1998 through 2004.  It is also undisputed that Khoury Bros. made no additional contributions to Guiragoss' account after 1997.

The Plan agreement Guiragoss signedspecifies that the Plan is unfunded and that Khoury Bros. has sole discretion to credit, or not credit, monies to participant accounts.[4]  Furthermore, the Plan agreement provides that monies in participant accounts would vest according to the employee's years of service.  Thus, 10% of the money credited to an employee account would vest after three years of employment, with an additional 10% vesting each year thereafter, and after ten years, participants could receive 100% of the money credited to their accounts.  Khoury Bros. did not establish or maintain separate accounts for contributions made to Guiragoss' or other employees' pensions under the Plan.  Instead, they merely denoted a contribution to the employee's "special fund" in the company's general records.  Each year, in February or March, employees (including Guiragoss) received a report that stated (i) their salary for the preceding year; (ii) any bonuses they received; and (iii) if they were Plan participants, any amount credited to their "special fund."  Yet, importantly, these credits to the special fund did not reflect actual transfers of money, as Khoury Bros. maintained no separate Plan accounts and instead kept all

---

[4]The Plan agreement specifically states:

Each year the Company may, in its absolute discretion, determine an amount to be credited to a separate account established by the Company for the benefit of the Employee . . . the Company may decide not to credit an amount to the Employee's separate account in any particular year and is under no obligation to do so. . . . [T]he Company has no obligation to fund this account.

company funds in one general asset pool.

Despite the Plan language, Guiragoss had a different understanding of the Plan agreement, based largely on the oral representations she alleges Khoury made.  She understood that the Plan was a way to defer taxation on her bonus payments and to provide for a retirement next egg.  To that end, Khoury allegedly told Guiragoss that Khoury Bros. would credit 50% of her bonuses to her deferred compensation account.  Relying on this, Guiragoss remained at Khoury Bros. for ten years, the period required under the Plan for her rights in all monies credited to her account to vest.  Guiragoss further avers that throughout this ten-year period Khoury consistently confirmed that Khoury Bros. was placing an amount equal to her bonuses in her Plan account.  As such, in 2004, after nearly ten years of employment, she was shocked to learn that Khoury Bros. had credited almost no money to her retirement account.  On October 18, 2004, she resigned.

In January 2005, Guiragoss submitted a written request to Khoury Bros. Seeking payment of $169,942.50 (her claimed benefits under the Plan), copies of all Plan documents, and any records concerning her account.  Khoury Bros. then issued a check to Guiragoss for $4,617.60, reflecting the actual amount it had credited to her "special fund" minus FICA taxes.  Guiragoss refused to accept this check because it included a notation stating that endorsement and acceptance would constitute a waiver of all future claims under the Plan.  Khoury Bros. did not provide Guiragoss any Plan documents or records of her account.  It now argues, somewhat inconsistently, that it did not maintain separate records for the Plan and that, if it did have any records, they were destroyed when flooding in Khoury's basement ruined many company records.

On February 21, 2006, Guiragoss filed an action in federal court for three counts arising under ERISA and three state common law claims.  Specifically, Guiragoss asserted a claim for breach of fiduciary duty under 29 U.S.C. § 1104(a)(1)(D), a claim for breach of cofiduciary duty under 29 U.S.C. § 1105, and a claim for injunctive relief under 29 U.S.C. §§ 1132(a)(3), (f), (g), as well as two claims for breach of contract and one claim of common law fraud under Virginia state law.  On June 30, 2006, Khoury Bros. filed a motion for summary judgment on two grounds.  First, that the Plan is a "top hat" plan exempt from ERISA's fiduciary and funding requirements, thus plaintiff's ERISA claims should be dismissed.  Second, because the Plan is covered by ERISA Guiragoss' state law claims are preempted and likewise should be dismissed.

The issues now ripe for disposition on summary judgment are first, whether the Plan agreement between Guiragoss and Khoury Bros. is governed by ERISA; second, if so, whether the state law claims are preempted; and third, whether the Plan is a "top hat" plan exempt from ERISA's fiduciary and funding requirements.

## II.

The threshold question is whether the Plan is governed by ERISA.  The principles that determine whether ERISA governs a pension or benefit plan are well settled.  To begin, it is settled that ERISA broadly applies to "any employee benefit plan established or maintained by an employer or employee organization engaged in commerce or in any industry or activity affecting commerce."  29 U.S.C. § 1003(a).  The statutory phrase "employee benefit plan," specifically encompasses employee welfare benefit plans, employee pension benefit plans, and plans that are combinations of both.  29 U.S.C. § 1002(3).  At issue here is an employee pension benefit plan, which is defined by ERISA as "any plan, fund, or program" that is "established or maintained by

an employer or by an employee organization" and "provides retirement income to employees, or results in a deferral of income by employees for periods extending to the termination of covered employment or beyond."  29 U.S.C. § 1002(2)(A).  And, a pension plan is deemed "established" under ERISA when a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving the benefits.  *Donovan v. Dillingham*, 688 F.2d 1367, 1373 (11th Cir. 1982).

In keeping with Congress' intent to establish exclusive federal control over pension plan regulation, ERISA's definition of an employee pension benefit plan is deliberately broad.  *See Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 138 (1990).  Indeed, ERISA governs every employee pension benefit plan, regardless of its methods for calculating contributions to the plan, calculating benefits under the plan, or distributing benefits under the plan.  29 U.S.C. § 1002(2)(A).  Furthermore, ERISA governs an employee pension benefit plan even when the plan fails to comply with all of ERISA's formal administrative and reporting requirements.  *See Scott v. Gulf Oil Corp.*, 754 F.2d 1499, 1503 (9th Cir. 1985) (holding that failure to comply with ERISA's formal requirements is not a basis to escape ERISA's reach); *Blau v. Del Monte Corp.*, 748 F.2d 1348 (9th Cir. 1984) (granting benefits under secret severance pay plan that violated many of ERISA's formal requirements).  To hold otherwise would create a perverse incentive for employers to disregard ERISA formalities so as to avoid ERISA's pervasive reach and thwart its requirements.

These principles and ERISA's plain language, applied to the undisputed record facts, make unmistakably clear that the Plan her in issue is an employee pension benefit plan governed

by ERISA.  Indeed, neither party disputes this conclusion.[5]  To begin with, Khoury Bros. is an

employer under ERISA's broad definition,[6] that, by virtue of its ownership of several retail

jewelry stores, is engaged in activity affecting commerce.  Thus, any plan established or

maintained by Khoury Bros. that provides retirement income or defers income to plan

participants will qualify as an employee pension benefit plan governed by ERISA.  The deferred

compensation agreement at issue here does just that.  Initially, although each Plan participant

signed an individual deferred compensation agreement, the agreement evidences that Khoury

Bros. established an ERISA-governed plan.  First, the agreement unequivocally states that

agreement is intended to provide Khoury Bros. employees, the class of beneficiaries,

supplemental retirement and/or death benefits.  Second, Section 2 suggests that funds will be

transferred to employee accounts from the Company's general assets.  Finally, Section 7

establishes formal claim procedures for receiving vested benefits.  Thus, the agreement easily

satisfies the test applied in *Donovan* to determine whether a plan has been established, and

indeed, there is no dispute that the agreement established an ERISA-governed plan.  It should be

noted that the fact that the Plan was established through an individual agreement is irrelevant.

*Biggers v. Wittek Indus. Inc.,* 4 F.3d 291, 298 (4th Cir. 1993) (finding that "ERISA allows for the

possibility of a single-employee plan.") (*citing* DOL, Office of Pension & Welfare Benefit

---

[5]Both parties agree that the Plan is an ERISA-governed pension plan.  Def's Mot. Summ.
J. 9 ("The parties agree that the Plan at issue is a pension plan covered by ERISA."); Pl.'s
Compl. 5 ("The Deferred Compensation Agreements offered by Defendant Khoury Brothers is . .
. covered by ERISA and subject to ERISA requirements.").

[6]29 U.S.C. § 1002(5) ("The term 'employer' means any person acting directly as an
employer, or indirectly in the interest of an employer, in relation to an employee benefit plan . .
.").

8

Programs, Opinion 91-20A (July 2, 1991)); *Cvelbar v. CBI Illinois Inc.*, 106 F.3d 1368, 1376

(7th Cir. 1997) ("Even if we must characterize the arrangement before us as a one-person plan,

we have no difficulty in holding that it is possible for a one-person arrangement to qualify as an

ERISA plan.").

Moreover, the Plan, which by its terms is a deferred compensation agreement, falls

squarely within the definition of ERISA employee pension benefit plan.  The Plan states that it is

intended to enable Khoury Bros.  "to retain the valuable services of the Employee" and "provide

the Employee with a supplemental retirement benefit and/or death benefit."  To that end, the Plan

provides that Khoury Bros. will assess its financial well being each year and, based on its

financial outlook, credit monies to the employee's account.  These monies are not be

immediately available to employees, but rather payment is deferred until employment is

terminated.  As such, the Plan satisfies all the requirements of an ERISA-governed employee

pension benefit plan.

### III.

Given that the Plan is governed by ERISA, the next question is whether Guiragoss' state

law claims are preempted.  Here, again, the governing principles are well settled. ERISA

"supersede[s] any and all State laws insofar as they may now or hereafter relate to any employee

benefit plan."  29 U.S.C. § 1144(a).  A state law "relates to an employee benefit plan, if it has a

connection with or reference to such a plan."  *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96-97

(1983).  The standard of "relating to" is easily met.  In fact, it can be satisfied by state laws that

are not specifically designed to affect ERISA plans or have only an indirect effect on ERISA

plans, regardless of whether these state laws are consistent with ERISA's substantive

requirements. *District of Columbia v. Greater Washington Bd. of Trade*, 506 U.S. 125, 129-30 (1992). Furthermore, even where a state law "relates to" an ERISA plan, but would provide relief unavailable under ERISA's civil enforcement provisions, ERISA preemption applies. *Wood v. Prudential Ins. Co. of America*, 207 F.3d 674, 678 (3d Cir. 2000) (stating that complete preemption does not depend on the type of relief requested in the complaint); *see Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 145 (1990) (concluding that "it is no answer to a pre-emption argument that a particular plaintiff is not seeking recovery of pension benefits").

The Fourth Circuit routinely upholds ERISA preemption of state law claims similar to those raised by Guiragoss. In *Coyne & Delaney Co. v. Selman*, 98 F.3d 1457 (4th Cir. 1996), a Fourth Circuit panel emphasized the need to evaluate ERISA's preemptive scope in connection with Congress' overall objective for the provision, that is, "to avoid a multiplicity of regulation in order to permit the nationally uniform administration of employee benefit plans." *Id.* at 1468 (*quoting New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 US. 645, 653 (1996)). With this in mind, the panel recognized several broad categories of state laws that are subject to ERISA preemption, including state laws that provide alternative means of securing ERISA plan benefits. *Id.* (*citing Travelers*, 514 U.S. at 661).[7]

Given ERISA's broad mandate, Guiragoss' state law claims clearly relate to the Plan and are therefore preempted. Guiragoss asserted two state law claims for breach of contract alleging

---

[7]Even prior to *Coyne & Delaney Co.*, the Fourth Circuit consistently upheld preemption of state law claims seeking to recover ERISA plan benefits. *See, e.g., Custer v. Pan Am Life Ins Co.*, 12 F.3d 410, 418 (4th Cir. 1993) (holding that state law claims that amount to a demand for past benefits under an ERISA plan are preempted); *Powell v. Chesapeake & Potomac Tel. Co.*, 780 F.2d 419, 422-24 (4th Cir. 1985) (holding that state law claims relating to the administration of an ERISA-governed plan are preempted).

that the defendants violated the contract between her and Khoury Bros. created by the deferred

compensation agreement and the oral representations made by Khoury.  She claimed that the

defendants violated the terms of the contract, for example, by (i) failing to make contributions to

her separate account in the amount equal to her bonuses, (ii) failing to keep records of accrued

contributions, and (iii) failing to distribute vested benefits in a timely fashion.  Additionally,

Guiragoss asserted a state law fraud claim arising from Khoury's oral representations concerning

contributions to the Plan.  All three claims refer to, and in fact seek to recover benefits due under

the deferred compensation agreement.  As determined above, the deferred compensation

agreement established the ERISA Plan and is the primary Plan document.  Accordingly, any

claims referring to or seeking to recover under the Plan, as embodied in the deferred

compensation agreement, are preempted by ERISA.  Moreover, this conclusion is buttressed by

*Coyne & Delaney Co.* because Guiragoss' state law claims are crafted as an alternative means to

recover benefits due under an ERISA-governed plan.[8]  Given that ERISA governs the Plan, and

that the state law claims seek benefits due under the Plan, ERISA compels the conclusion that the

state law claims are preempted.[9]

## IV.

The third and final issue is whether the Plan is a "top hat" plan.  This is a significant issue

because top hat plans are exempt from the bulk of ERISA's substantive requirements.  The

---

[8]Pl.'s Compl. 1 ("This is an action for fiduciary breach, and an action to enjoin the violation of the terms of an employee benefit plan.  *Alternatively*, this is an action for breach of contract and fraud relating to a deferred compensation contract.").

[9]Recognizing that preemption applies, Guiragoss recently filed an Amended Complaint that omits these state law claims.  Because it was filed after the July 21, 2006 Order dismissing the state law claims, it is immaterial to the analysis presented here.

principles governing whether a Plan qualifies as a top hat plan are not as well settled as those for other ERISA provisions.  Indeed, the term "top hat" does not appear anywhere in the statute.  Instead it is a colloquial term used to refer to certain unfunded plans specially exempted from ERISA's participation, vesting, funding, and fiduciary requirements.[10]  29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(10).

Importantly, top hat plans are a "rare sub-species" of ERISA plans.  *Senior Executive Benefit Plan Participants v. New Valley Corp.* (*In re New Valley Corp.*), 89 F.3d 143, 148 (3d Cir. 1996).  To be designated a top hat plan, ERISA requires that the plan be (1) "unfunded" and (2) "maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees."  29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(10); *see also Reliable Home Health Care, Inc. v. Union Central Ins. Co.*, 295 F.3d 505, 513 (5th Cir. 2002) (applying ERISA's statutory requirements using a two-step inquiry to analyze a proposed top hat plan); *Demery v. Extebank Deferred Compensation Plan*, 216 F.3d 283, 287 (2d Cir. 2000) (same).  Apart from this, the Department of Labor (DOL) has indicated, through advisory opinion letters entitled to *Skidmore* deference,[11] that courts should

---

[10]ERISA refers to top hat plans only in the context of their exemption from the vesting and participation requirements, 29 U.S.C. §§ 1051-61, funding requirements, 29 U.S.C. §§ 1081-86, and fiduciary responsibilities, 29 U.S.C. §§ 1101-1114.  ERISA does not exempt top hat plans from compliance with reporting, disclosure, administration and enforcement provisions. *See* 29 U.S.C. §§ 1021-31, 1131-45.

[11]Agency opinions are entitled to respect under *Skidmore v. Swift & Co., 323 U.S. 134 (1944),* "only to the extent the interpretations have the 'power to persuade.'"  *Christensen v. Harris County,* 529 U.S. 576, 587 (2000); *see also United States v. Mead Corp.*, 533 U.S. 218, 235 (2001) ("An agency's interpretation may merit some deference, whatever its form, given the 'specialized experience and broader investigations and information' available to the agency, and given the value of uniformity in its administrative and judicial understandings of what a national law requires.").  Where the language of the regulation is ambiguous, the agency interpretation is

look to whether a particular plan satisfies Congress' underlying objective when it authorized

exemptions for top hat plans.  Specifically, courts should consider a third factor, that is, whether

the employees participating in the alleged top hat plan have sufficient influence within the

company to negotiate compensation agreements that will protect their own interests where

ERISA provisions do not apply.  *Id.* (citing  DOL, Office of Pension & Welfare Benefit

Programs, Opinion 90-14A, 1990 WL 123933 at *1 (May 8, 1990)).  When undertaking this

three-part analysis, it is important to note that ERISA is a remedial statute that should be liberally

construed in favor of employee benefit fund participants.  To that end, "exemptions from . . .

ERISA coverage should be confined to their narrow purpose."  *Kross v. Western Elec. Co., Inc.*,

701 F.2d 1238, 1242 (7th Cir. 1983) (*quoting Rose v. Long Island R.R. Pension Plan*, 690 F.2d

49, 54 (2d Cir. 1982)).

In undertaking this three-part analysis, it is, of course, necessary to examine the language

used in the plan documents.  And, in this regard, it is clear that merely inserting the ERISA

definition of a top hat plan into a document is insufficient if the actual plan does not satisfy the

top hat requirements, although a plan's language is indicative of the employer's intent when

establishing the plan and may influence the court's determination.  *Compare Accardi v. IT Litig.*

---

entitled to greater deference.  *Auer v. Robbins*, 519 U.S. 452, 461 (1997).

It is also worth noting that given the paucity of authority on top hat plans, other courts
have also consulted the DOL advisory opinion letters for guidance.  *See, e.g., Gallione v.
Flaherty*, 70 F.3d 724, 729 (2d Cir. 1995) (citing DOL opinion to explain Congress' intent when
establishing top hat plan exemption); *Carrabba v. Randalls Food Markets, Inc.*, 38 F. Supp. 2d
468, 479 (N.D. Tex. 1999) (applying DOL opinion's top hat standard to evaluate plan).  To the
extent that the DOL interpretation is persuasive, it is applied herein.

*Trust (In re: IT Group, Inc.)*, 448 F.3d 661 (3d Cir. 2006) (affirming top hat designation where plan agreement stated that the plan was unfunded and only for employees who are part of select group of management or highly compensated employees), *and Bakri v. Venture Mfg., Co.*, No. 03-405, 2005 U.S. Dist LEXIS 26076 at  (S.D. Ohio Oct. 31, 2005) (same), *with Carabba*, 38 F. Supp. 2d at 471 (finding no top hat plan, when all salaried employees had the option to join, despite plan language stating it was for a select group of management and highly compensated employees), *and Virta v. DeSantis Enters., Inc.*, No. 94-1378, 1996 U.S. Dist LEXIS 17110 at *8-9 (N.D.N.Y. Nov. 7, 1996) (holding that despite plan document language, where evidence showed that the plan was presented to low-paid, non-management workers, including maintenance workers, cooks, and hostesses, the plan was not a top hat plan).

The first step in the top hat inquiry is determining whether the plan is unfunded.  The analysis is straightforward and depends on whether the plan has a funding source apart from the general assets of the company.  *Reliable Home Health Care, Inc.*, 295 F.3d at 514.  Specifically, courts have asked

> can the beneficiary establish, through the plan documents, a legal right any greater than that of an unsecured creditor to a specific set of funds from which the employer is, under the terms of the plan, obligated to pay the deferred compensation.

*Demery,* 216 F.3d at 287 (citing *Miller v. Heller*, 915 F. Supp. 651 (S.D.N.Y. 1996)).  If there is no separately maintained account distinct from the company's general assets, then the plan is unfunded.  In less obvious cases, the tax consequences of a plan are instructive.  Specifically, if the plan beneficiaries did not incur tax liability during the year that contributions to the plan were made, the plan is more likely to be deemed unfunded.  *See Reliable Home Health Care, Inc.*, 293

F.3d at 514 (*citing Miller*, 915 F. Supp. 651, 659 (S.D.N.Y. 1996)).

Analysis of the second statutory requirement–whether the plan is maintained primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees–requires a fact specific inquiry that examines both quantitative and qualitative factors. *See Demery* at 288 (citing *Duggan v. Hobbs*, 99 F.3d 307, 312 (9th Cir. 1996) (noting that "the 'select group' requirement requires more than a mere statistical analysis"); *In re New Valley Corp.*, 89 F.3d at 148 ("In number, the plan must cover relatively few employees.  In character, the plan must cover only high level employees.").  First, it must be determined that the plan was offered to a "select group."  Relevant factors include the percentage of the total workforce invited to join the plan (the quantitative factor) and the nature of their employment duties, the compensation disparity between top hat plan members and non-members, and the actual language of the plan agreement (the qualitative factors).  *See, e.g.*, *Carrabba v. Randalls Food Markets, Inc.*, 38 F. Supp. 2d 468, 479 (N.D. Tex. 1999), *aff'd* 252 F.3d 721 (5th Cir. 2001).  Second, the select group must consist of management or highly compensated employees.  This analysis will turn on the same qualitative factors identified for the selectivity requirement.  Thus, examination of the qualitative factors is deferred until this second step.  *See Darden*, 71 F. Supp. at 397 ("Prior cases . . . have not analyzed the 'select group' provision separately from the 'highly compensated employee' provision.").

The first statutory requirement requires an analysis of whether the plan was offered to a select group.  There is no existing authority that firmly establishes when a plan is too large to satisfy the select group requirement.  A review of the published case reflects that there is no existing authority that affirms top hat status for a plan representing more than 16% of the total

workforce.[12]  In *Demery*, the Second Circuit approved top hat designation for a plan offered to

15.34% of the employees, but qualified its ruling, stating that "this number [was] probably at or

near the upper limit of the acceptable size for a 'select group.'"[13]  216 F.3d at 289.  In other cases

the percentage of the workforce invited to enroll in the top hat plan has been considerably

smaller.  *See, e.g.*, *Gallione*, 70 F.3d at 724 (plan participation offered to less than one-fifth of

one percent of union membership); *Belka v. Rowe Furniture Corp.*, 571 F. Supp. 1249, 1251 (D.

Md. 1983) (plan covered 1.6% to 4.6% of workforce).  Not surprisingly, if all employees are

eligible to participate, the plan cannot qualify as a top hat plan, notwithstanding the number of

employees that actually enroll.[14]  *See Carabba*, 38 F.Supp. 2d 468, 473 (N.D. Tex. 1999);

*Hollingshead v. Burford Equip Co.*, 747 F.Supp 1421, 1430 (M.D. Ala. 1990).

The second statutory requirement requires examining whether the claimed select group

was composed of management or highly compensated employees.  If plan participation is not

based on an employees' managerial status or compensation level, then the plan is not a top hat

---

[12]*See In re: The IT Group, Inc.*, 305 B.R. 402, 410 (Bankr. D. Del. 2004) ("With respect to the quantitative 'select group' restriction, the highest percentage of employees covered by a plan found to have been a 'top hat' plan, while not a bright line test, has been 15%); *Darden v Nationwide Mutual Ins. Co.*, 717 F. Supp. 388, 397 (E.D.N.C. 1989), *aff'd*, 922 F.2d 203 (4th Cir. 1991), *rev'd on other grounds*, 503 U.S. 318 (1992) ("the court finds that the group in question here, comprising almost one-fifth of the total Nationwide workforce is too large to be considered 'select' for purposes of the top hat exemption.")

[13]Moreover, the *Demery* analysis was influenced significantly by the characteristics of the plan members in that they were all assistant vice-presidents, managers, or other senior officers of a large banking corporation.  216 F.3d at 285.

[14]Although the relevant case law is not entirely consistent on this point, the analysis should focus on the percentage of the workforce invited to participate in a potential top hat plan, rather than on the percentage of the workforce that actually enrolled.  Note, however, that where the percentage of the total workforce enrolled in the plan is too large to satisfy the select group requirement, the distinction is irrelevant because the number of enrolled members necessarily reflects either all or a subset of the employees invited to enroll.

plan, regardless of participation rates.  *Starr v. JCI Data Processing, Inc.*, 757 F. Supp. 390, 394 (D.N.J. 1991).  With respect to employees' managerial status, although supervisor responsibilities are not a requirement,[15] there must be some well established basis for designating eligible Plan members as "high level" employees.[16]  And, "[t]he mere fact that the employer intends the plan to be a reward to 'key' employees does not satisfy the degree of selectivity contemplated by the statutes."  *Carrabba*, 38 F. Supp. 2d at 477.   Furthermore, although there is no firm benchmark to satisfy the highly compensated requirement, it may be satisfied if there exists a noticeable disparity between the salaries of top hat plan participants and other employees.  In *Demery* for example, the average salary of top hat plan participants was more than double the average salary for all other company employees.  216 F.3d at 289.

A third requirement, provided by DOL advisory opinions, is that the select group consist of individuals who are in the position to protect their own interests.  This requirement helps ensure that ERISA's underlying objectives of ERISA are not undermined by the plan's exemption from specific ERISA requirements.  Top hat plans were conceived as a way to free deferred compensation agreements for certain executives from the burden of ERISA regulation.  The assumption underlying the top hat exemption from ERISA is simply that top-level executives are in a favorable bargaining position to negotiate the terms of an agreement and,

---

[15]*See Bakri v. Venture Mfg. Co.*, No.03-405, 2005 U.S. Dist LEXIS 26076 at * 15 (S.D. Ohio. Oct. 31, 2005) (stating that "the fact that Bakri supervised no one is not legally relevant to whether she was a 'high level' executive").  In *Bakri*, the employee at issue was the Orders Entry Manager and performed all of the company's systems administration duties and all of the responsibilities of a logistics manager.

[16]See Lee T. Polk, *ERISA Practice & Litigation* § 2:4 n. 9 (2005) (citing Op. Dep't Labor 79-75A (plan covering secretary not a top hat plan); Op. Dep't Labor 85-37A (plan covering 50 out of 750 employees, including foremen, a superintendent, assistant in cost department, order department clerk, expediter, etc. not top hat plan).

therefore, do not need a comprehensive regulatory scheme, like ERISA, to protect their interests. Lee T. Polk, *ERISA Practice & Litigation* § 2:4 ( 2005); *see also Gallione v. Flaherty*, 70 F.3d 724, 728 (2d Cir 1995).[17]  Moreover, it is because top hat plans "benefit only highly compensated executives, and largely exist as devices to defer taxes, [that] they do not require such scrutiny and are exempted from much of ERISA's regulatory scheme." *Kemmerer v. ICI Americas Inc.*, 70 F.3d 281, 286 (3d Cir. 1995).

In essence then, a top hat plan must satisfy three requirements.  First, it must be unfunded; second, it must be maintained primarily for the purpose of providing deferred compensation to a select group of management or highly compensated employees; and third, its members must be sufficiently well-positioned and informed to negotiate an agreement that protects their own interests.  These criteria, applied here, point persuasively to the conclusion that the Plan is not a top hat plan.

There is no doubt the Plan is unfunded.  The Plan documents, signed by Guiragoss, clearly state that "[t]he Company's obligations under this Agreement shall be an *unfunded* and unsecured promise to pay.  The Company *shall not be obligated* under any circumstances *to fund* its obligations under the Agreement."  (emphasis added).  In practice, Khoury Bros. did not establish any special accounts or otherwise designate funds to fulfill its obligations under the

---

[17]*Gallione* cited a DOL advisory opinion, DOL, Office of Pension & Welfare Benefit Programs, Opinion 90-14A, 1990 WL 123933 at *1 (May 8, 1990):

> In providing relief for top hat plans from the broad remedial provisions of ERISA, Congress recognized that certain individuals, by virtue of their positions or compensation level, have the ability to affect or substantially influence, through negotiation or otherwise, the design and operation of their deferred compensation plan, taking into consideration any risks attendant thereto, and therefore, would not need the substantive rights and protections of Title I.

Plan.  Guiragoss does not dispute that the Plan was unfunded and, in fact, she claims that Khoury

Bros. breached its fiduciary duty under the Plan by failing to adhere to ERISA's funding

requirements.  On this record, the unfunded requirement has been satisfied.

Next, while Plan participation was limited to a few employees, it does not appear that

they were a select group.  There is no clear evidence indicating who was offered enrollment in

the Plan.  The Khoury Bros., however, argue that the Plan was selective because only four

employees participated in the Plan.  This is not persuasive.  The employee lists in the summary

judgment record indicate that the workforce was comparatively small and that the majority of

Khoury Bros.' employees were either family members or sales staff.  In fact, during the period

from 1995 to 1997, there were never more than four permanent full-time employees who were

not members of the Khoury family.  Of that small number, as many as three were enrolled in the

Plan at various times.  With such a small total workforce, the Plan's low enrollment is essentially

meaningless,[18] and in fact, points persuasively to the conclusion that the Plan was not a top hat

plan. Assuming, as the record reflects, that the total workforce consists of all the permanent, full-

time employees, then from 1995 to 1997, almost 75% of the total workforce was enrolled in the

Plan.  This level far exceeds the 15.34% threshold approved in *Demery* and recognized as the

upper limit of the acceptable size for a select group.   Additionally, Khoury Bros. cannot even

rely on the Plan documents to support their top hat argument because the documents contain no

reference to selective member requirements.  As explained in *Hollingshead*, the mere fact that

---

[18]The facts of this case are sharply distinguishable from the Ninth Circuit opinion in
*Duggan,* where the panel affirmed top hat designation for an ERISA plan that covered only one
employee.  There, although the plaintiff was not in management, his salary was almost five times
greater than the average employee salary and twice as much as the next highest paid individual.
In addition, the plaintiff hired an attorney to negotiate the terms of the plan on his behalf.
*Duggan,* 99 F.3d at 308.

the Khoury Bros. intended for the Plan to reward "key" employees does not meet the degree of selectivity required by ERISA. *See Hollingshead* 747 F. Supp. at 1429 (finding that plan limited to "key employees" was not a top hat plan where that status was based on factors other than compensation and managerial position, namely "time of service, contribution to the company, [and] loyalty"). Put simply, there is no evidence in the record that the Plan was primarily designed to reward an appropriately select group.

Significantly, the group of Khoury Bros. employees that participated in the plan were neither management nor highly compensated employees. To begin, neither party disputes that Guiragoss was merely a salesclerk at the time she enrolled in the Plan. Yet, the parties do dispute whether Guiragoss was a keyholder at the time of enrollment. This dispute is irrelevant because assigning to a salesclerk the responsibility of opening and closing a store is not sufficient, by itself, to establish that Guiragoss was a high-level employee with managerial responsibilities. Indeed, Guiragoss claims that despite her keyholder status, she was a salesclerk "expected to clean, vacuum, dust and clear trash from the store." Khoury Bros. offers no evidence to the contrary and has not provided a scintilla of evidence that Guiragoss was promoted, had any supervisory responsibilities, or otherwise acted as a manager. As such, Guiragoss cannot be characterized as having managerial duties.

Nor was the nature of Guiragoss' compensation in 1995 high enough to be considered a high-level employee. In 1995, when Khoury invited Guiragoss to enroll in the Plan, she had been working as a salesclerk for Khoury Bros. for less than a year and her salary was commensurate

with all other full-time employees.[19]  From an objective standpoint, an individual earning an annual salary of $32,950 is not highly compensated.  Moreover, within Khoury Bros., she was not a highly compensated employee.  At the time of her enrollment, Guiragoss was earning $7.75 an hour.  Over the course of the year, she earned the fifth highest salary of eleven full-time employees, placing her near the median salary level, and her salary was far closer to the lowest paid employee than to the highest paid employee.[20]  Additionally, it is instructive that Brian Widdowson, the first Plan member was earning the seventh highest salary of eleven employees at the time he enrolled.  While it is true that not every member of a top hat plan must be highly compensated or in a management position as long as the plan is primarily for such individuals, Khoury Bros. cannot seriously assert that its Plan, which enrolled salesclerks whose salaries were roughly in the middle of the pay scale, was primarily for the benefit of highly compensated employees.  The only reasonable inference from these facts is that the Plan was primarily for Guiragoss, and other salesclerks, not that she was an exception to the rule.

Finally, it is evident that the Plan's participants, and Guiragoss in particular, did not have sufficient influence to negotiate with Khoury Bros. to create a favorable agreement.  A jewelry store salesclerk does not possess the bargaining clout to craft a favorable pension agreement that will protect her interests, particularly after less than one year of employment.  The terms of the

---

[19]Any information relating to Guiragoss' annual compensation or job responsibilities and duties after 1995 is irrelevant for determining whether the Plan applied to a select group of management or highly compensated employees.  This is so because events subsequent to Guiragoss's enrollment did not influence Khoury's initial decision to extend the offer of Plan participation.  In other words, a plan qualifies as a top hat plan at its inception, or by amendment or modification; a plan does not morph from a non-top hat plan into a top hat plan merely because its membership may change over time.

[20]At the time of her enrollment, Guiragoss was earning approximately $14,700 more than the lowest paid employee and approximately $27,000 less than the highest paid employee.

deferred compensation agreement between Guiragoss and Khoury Bros. only reinforce this conclusion.  The Plan agreement gave Khoury Bros. the sole discretion to credit or not credit money to Guiragoss' account.  Moreover, Guiragoss has stated, without contradiction, that she did not understand the legal ramifications of the agreement, and in fact relied entirely on Khoury's representation of the Plan.  Unlike the plaintiff in *Duggan*, who hired an attorney and successfully negotiated a more favorable agreement,[21] Guiragoss had no influence on the terms of the agreement and never consulted with an attorney prior to signing the agreement.  Guiragoss is precisely the type of employee that ERISA's substantive provisions are intended to protect and Khoury Bros. cannot be permitted to use top hat designation to shield it from liability.

From the foregoing analysis, it is clear that Khoury Bros. failed to meet the requirements for designation as a top hat plan.  Accordingly, defendant's motion for summary judgment must be denied.

An appropriate order has issued.


_____/s/_____

Alexandria, Virginia                                   T. S. Ellis, III
August 10, 2006                                        United States District Judge

---

[21]*Duggan*, 99 F.3d at 310-11.